United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD LANCE REYNOLDS,<br><br>Plaintiff,<br><br>v.<br><br>J. MERENDA,<br><br>Defendant. | Case No. 17-cv-04202-SI<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 27 |

In this *pro se* prisoner's civil rights action under 42 U.S.C. § 1983, Richard Lance Reynolds claims that correctional officer Merenda violated Reynolds' Eighth Amendment rights. Merenda now moves for partial summary judgment on the merits of Reynolds' claim and on the defense of qualified immunity. Reynolds does not oppose the motion. For the reasons discussed below, Merenda's motion for partial summary judgment will be granted. The case will be referred to the *Pro Se* Prisoner Mediation Program.

**BACKGROUND**

Reynolds alleges that Merenda used excessive force on two occasions: (1) during efforts to handcuff Reynolds in the medical area and (2) in Merenda's office, moments after the handcuffing. Only Merenda's actions surrounding Reynolds' handcuffing are at issue in the pending motion. Therefore, only facts related to that incident are described below. Viewed in the light most favorable to Reynolds,[1] the evidence shows the following events occurred while Reynolds was at the

---

[1] Merenda states that he intends to dispute many of Reynolds' factual assertions at trial but assumes those assertions to be true for purposes of the motion for summary judgment. Docket No. 27 at 7.

Correctional Training Facility in Soledad:

On April 5, 2016, an alarm sounded while Reynolds was exiting the bathroom at the Facility "D" Yard Clinic. Docket No. 1 at 3. After exiting the bathroom, Reynolds was instructed to sit down on the clinic bench. *Id*. As Reynolds was attempting to comply with these instructions, Merenda yelled at Reynolds: "'Hey[,] don't you know you are suppose [sic] to sit down when the alarm is sounding, you stupid Mother Fucker?'" *Id*.[2] At this point, Reynolds apparently was seated, but after hearing Merenda's comment, Reynolds "jumped up on [his] feet" again and said to Merenda: "Hey, you know what, fuck you, you fucking cock sucker." Docket No. 27-2 at 15. Reynolds continued to yell at Merenda: "I was in the fucking bathroom, fucking pissing when that fucking alarm went off." *Id*. Reynolds stated at his deposition that he "didn't hold [his] lip" and "let [Merenda] have it" for cursing at him. *Id*. at 16.

In response to Reynolds' comments and actions, Merenda told Reynolds to put his arms against the wall. Docket No. 1 at 3. Reynolds extended his left arm straight up on the wall. However, Reynolds could only extend his right arm about 90 degrees away from his body and told Merenda that "'this arm doesn't go up any more. It's fucking titanium.'" Docket No. 27-2 at 18; *see also* Docket No. 1 at 3. (Although Reynolds states in his complaint his left arm had limited mobility, he testified at his deposition that the problem arm was actually his right arm.) Merenda did not accept Reynolds' claim and attempted to pull Reynolds' right arm up the wall to match the left arm's position. Docket No. 27-2 at 18–19. As Merenda began to move Reynolds' right arm "maybe three [or] four inches" up the wall, Reynolds yelled "it won't go up, [my arm]'s fucking titanium." *Id*. at 20–21. Merenda stopped moving Reynolds right arm immediately after Reynolds yelled out. *Id*. at 22. However, the movement of Reynolds' arm was enough to cause him "severe and extreme pain." Docket No. 1 at 3; *see also* Docket No. 27-2 at 24. The pain lasted three to five seconds. Docket No. 27-2 at 26. Merenda then moved both of Reynolds' arms behind Reynolds' back and pushed him through a door. *Id*. at 22. This action also caused Reynolds discomfort, but

---

[2] The parties' language is quoted not for its eloquence but to give context to their actions. Reynolds urges that Merenda's disrespectful language triggered Reynolds' responsive comments and behavior; Merenda urges that Reynolds' comments and behavior prompted the need to restrain Reynolds.

Reynolds did not mention it to Merenda. *Id*. at 24. Reynolds was not physically injured as a result of these actions.

Once outside, Reynolds was handcuffed. Reynolds believes he was handcuffed by correctional officer Gomez, apparently at Merenda's request. *Id*. at 23 ("I'm pretty sure Gomez gets involved and he's the one that handcuffed me . . . ."; *id*. at 25 ("Q. Do you remember who it was who put the handcuffs on? A. I'm almost sure it was Gomez because he is the C.O. that went . . . with [Merenda]."). After being handcuffed, Reynolds was led to Merenda's office. (As noted earlier, Reynolds contends excessive force was used on him in the office also, but Merenda has not moved for summary judgment on that claim.)

At the relevant time, Reynolds had a titanium shoulder replacement and a titanium rod in his upper arm. Docket No. 27-2 at 11. There is no evidence that having a titanium shoulder replacement or titanium rod necessarily limits a person's range of motion. There also is no evidence that Reynolds had anything visible (such as a brace) that would have suggested to Merenda that Reynolds' range of motion was limited.

**LEGAL STANDARD**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to

3

the nonmoving party to "go beyond the pleadings and by [his or her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald,* 55 F.3d 454, 460 & nn.10–11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, Reynolds' complaint and amendment thereto (Docket Nos. 1 and 13) were signed under penalty of perjury and the facts in them are considered as evidence for purposes of deciding the motion.

The court's function on a summary judgment motion is not to make credibility determinations nor to weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *Id*. at 631.

**DISCUSSION**

Plaintiff Reynolds claims defendant Merenda violated Reynolds' Eighth Amendment rights when Merenda forcefully restrained Reynolds following Reynolds' confrontation of Merenda. Merenda contends that no Eighth Amendment violation occurred and to the extent one did, Merenda is entitled to qualified immunity because it would not have been clear to a reasonable officer that Merenda's conduct was unlawful at the time.

A. Qualified Immunity Defense

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

4

The doctrine of qualified immunity attempts to balance two important and sometimes competing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To determine whether an official is entitled to qualified immunity, the court must decide whether the facts show the official's conduct violated a constitutional right; and, if so, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Saucier v. Katz*, 533 U.S. 194, 201–02 (2001); *see also generally Pearson*, 555 U.S. 223 (overruling *Saucier*'s requirement that qualified immunity analysis proceeds in a particular sequence).

1. Eighth Amendment Violation

The treatment an inmate receives in custody and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993). When a prison official stands accused of using excessive force in violation of the Eighth Amendment, the core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992); *Jeffers v. Gomez*, 267 F.3d 895, 912-13 (9th Cir. 2001) (applying "malicious and sadistic" standard to claim that prison guards used excessive force when attempting to quell a prison riot). In determining whether the use of force was for the purpose of maintaining or restoring discipline, or for the malicious and sadistic purpose of causing harm, a court may evaluate the need for application of force, the relationship between that need and the amount of force used, the extent of any injury inflicted, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. *Hudson*, 503 U.S. at 7; *LeMaire v. Maass*, 12 F.3d 1444, 1454 (9th Cir. 1993); *see also Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979) (guards may use force only in proportion to need in each situation).

Here, there was a need for some force against Reynolds in response to Reynolds' verbal outburst and physically provocative actions. After Merenda yelled at Reynolds, Reynolds admitted that he was visibly angry at Merenda and made it clear by jumping up from a seated position to

5

confront Merenda and hurling Merenda's initial insult back at him, along with other expletives. *See* Docket No. 27-2 at 15–16. Reynolds' outburst threatened order within the prison and could have reasonably been perceived by Merenda to require force to reestablish it. These facts support the conclusion that Merenda's conduct was aimed at maintaining or restoring discipline, not for the malicious and sadistic purpose of causing harm.

In addition, the amount of force used by Merenda was appropriate for the need. Although Reynolds' actions were not overly aggressive, neither was Merenda's response. By restraining Reynolds, Merenda restored order to the situation using minimal force. Reynolds did not suffer physical injuries from the initial handcuffing—just three to five seconds of pain. (There is no evidence that the bruises mentioned in the complaint were due to the movement of the arm; rather, the bruises alleged in the complaint apparently resulted from the object that hit Reynolds in the face while in Merenda's office.) The lack of injuries is not dispositive. *See Hudson*, 503 U.S. at 7. However, it is another factor that indicates Merenda did not use force maliciously and sadistically to cause harm. *See id.* at 9-10 (not every "malevolent touch by a prison guard gives rise to a federal cause of action. . . . The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force.")

Reynolds' position apparently is that Merenda had to accept Reynolds' assertion at face value that his right shoulder was made of titanium and had limited mobility. This is not the case. In scenarios where a suspect tells an officer about a pre-existing injury, the "officer need not endanger himself by unduly crediting [the] suspect's mere claim of injury." *Winterrowd v. Nelson*, 480 F.3d 1181, 1184 (9th Cir. 2007).[3] There is no evidence that existence of a titanium shoulder necessarily means the arm's motion is limited; rather, it was Reynolds' individual situation that his

---

[3] In *Winterrowd*, police officers pulled over plaintiff Winterrowd because they believed his car's license plates were invalid. *Id.* at 1182. Winterrowd was asked to put his arms behind his back for a pat down. *Id.* Winterrowd told the police officers that because his right shoulder was injured, his right arm could not reach behind his back. *Id.* at 1182. Ignoring this information, a police officer forced Winterrowd on to the hood of Winterrowd's car, grabbed his right arm, and pushed it behind his back. *Id.* at 1183. Winterrowd screamed in pain, but the officer did not let go. Instead, the officer "applied greater pressure, pumping [Winterrowd's] arm up and down." *Id.* The court ultimately found the police officer's use of excessive force a violation of Winterrowd's constitutional rights. *See id.* at 1186.

6

arm's range of motion was limited due to his particular shoulder replacement. Therefore, Merenda did not have to immediately cease all efforts to restrain Reynolds in light of his claim of pre-existing injury. By ceasing to apply pressure to Reynolds' right arm after moving the arm just a few inches and confirming Reynolds' claim that the right arm's motion was limited, Merenda tempered his use of force appropriately for the situation.[4]

For the reasons stated above, the Court concludes that no reasonable jury could find an Eighth Amendment violation occurred when Merenda moved Reynolds' arm a few inches in preparation for handcuffing.

With respect to the actual handcuffing, the record shows a different correctional officer, not Merenda, handcuffed Reynolds at Merenda's direction. Reynolds explained this in his deposition, and it is not disputed in his verified complaint. In addition, regardless of who actually handcuffed Reynolds, this force was a good-faith effort to restore discipline after Reynolds' outburst for the same reasons outlined above. Whoever handcuffed Reynolds was reasonably responding to the same threat Merenda was attempting to address when he initially patted down and restrained Reynolds. As a result, the Court concludes that no reasonable jury could find an Eighth Amendment violation occurred during the actual handcuffing of Reynolds, let alone a violation by Merenda.

### 2. A Reasonable Official Could Have Thought the Acts Lawful

In this case, Merenda prevails on the first prong of the *Saucier* test because there was not a violation of Reynolds' Eighth Amendment right to be free from cruel and unusual punishment. *See Saucier*, 533 U.S. at 201 (threshold question in qualified immunity analysis is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"). Even assuming, arguendo, that there was an Eighth Amendment violation in Merenda's actions, Merenda would prevail on the second prong of the qualified

---

[4] This fact helps distinguish Reynolds' case from *Winterrowd*. The police officer in *Winterrowd* continued to hurt Winterrowd after realizing his pre-existing injury was real by applying greater force and "pumping [Winterrowd's] arm up and down." *Winterrowd*, 480 F.3d at 1183. Conversely here, Merenda immediately stopped moving Reynolds' arm and let it down when Reynolds yelled out in pain.

immunity test because there was no clearly established law controlling the specific facts of this case.

"An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it,' meaning that 'existing precedent . . . placed the statutory or constitutional question beyond debate.'" *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (alteration and omission in original; citation omitted). This is an "exacting standard" which "gives government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Id.* (alteration in original; internal quotation marks omitted); *see, e.g., Carroll v. Carman*, 574 U.S. 13, 16–18 (2014) (law not clearly established whether officer may conduct a "knock and talk" at any entrance to a home that is open to visitors, rather than only at the front door); *Hines v. Youseff*, 914 F.3d 1218, 1229 (9th Cir. 2019) (defendants entitled to qualified immunity where "the specific right that the inmates claim in these cases—the right to be free from heightened exposure to Valley Fever spores—was not clearly established at the time"); *Horton v. City of Santa Maria*, 915 F.3d 592, 601–02 (9th Cir. 2019) (officer entitled to qualified immunity on failure-to-protect claim from pretrial detainee who attempted to hang himself because there was conflicting information as to whether he was suicidal and the case law "was simply too sparse, and involved circumstances too distinct from those in this case, to establish that a reasonable officer would perceive a substantial risk that [detainee] would imminently attempt suicide").

The Supreme Court "has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (officer entitled to qualified immunity for shooting a woman who was armed with a large knife, was ignoring officers' orders to drop the weapon, and was within striking distance of her housemate; prior cases on excessive force did not clearly establish that it was unlawful to use force under these circumstances, where officer may not have been in apparent danger but believed woman was a threat to her housemate).

Here, it would not have been clear to a reasonable official in Merenda's position that he must accept at face value an inmate's claim of a pre-existing injury, and that he must attempt to handcuff

the inmate in a manner consistent with such a claim. Nor is there clearly established law that a correctional officer must accept at face value an inmate's claimed physical inability to comply with a request. Indeed, the one case found nearly on point, *Winterrowd*, explained that an officer does *not* need to accept a suspect's claim of pre-existing injury. *Winterrowd*, 480 F.3d at 1184.[5]

It also was not clearly established law that an inmate—who physically confronts a correctional officer—has "the right to be free from forceful restraint against a wall." *Cabrera v. Clark Cty. Det. Ctr.*, No. 2:12-cv-00918-RFB-CWH, 2016 U.S. Dist. LEXIS 49678, at *20 (D. Nev. Apr. 12, 2016). In *Cabrera*, the plaintiff inmate Cabrera was slammed against a wall by defendant correctional officer Neville after Cabrera disrupted a class Neville was leading and physically confronted Neville. *Id*. at *5–*6. Neville held Cabrera against the wall for thirty seconds before instructing Neville to return to his seat. *Id*. In granting the officer's summary judgment motion, the court determined that there was no Eighth Amendment excessive force violation. *Id*. at *19. Furthermore, the court noted Neville was entitled qualified immunity "even if Cabrera had been slammed more forcefully against the wall," given the medical evidence indicating a lack of injuries. *Id*. at *21–*22.

Here, the facts are nearly identical to *Cabrera* so it would not have been clear to Merenda that his conduct was unlawful. In both cases, (1) an inmate stood up in a physically provocative manner and mouthed off to the officer, (2) the officer responded by forcefully restraining the inmate against the wall, and (3) there was a lack of medical evidence of any injury to the inmate. Although the plaintiff in *Cabrera* did not have a physical impairment, because Merenda stopped moving Reynolds' arm as soon as he confirmed Reynolds' assertions of its limited motion, any momentary pain suffered from this movement does not differentiate the case from *Cabrera*. Therefore, even if a constitutional violation did occur, Merenda is entitled to qualified immunity because it would not have been clear to Merenda that his actions were unlawful.

---

[5] Although *Winterrowd* involved a free citizen, the same rule can be applied to inmates. The rule may even provide correctional officers greater latitude than police officers because prisoners "have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint," *Hudson v. Palmer*, 468 U.S. 517, 526 (1984).

C.   Referral to *Pro Se* Prisoner Mediation Program

With only one excessive force claim remaining, this case appears to be a good candidate for the court's mediation program. Good cause appearing therefor, this case is now referred to Magistrate Judge Illman for mediation or settlement proceedings pursuant to the *Pro Se* Prisoner Mediation Program. The proceedings will take place within 120 days of the date this order is filed. Magistrate Judge Illman will coordinate a time and date for mediation or settlement proceedings with all interested parties and/or their representatives and, within five days after the conclusion of the proceedings, file with the court a report for the prisoner mediation or settlement proceedings.

Plaintiff must attend and participate in the mediation or settlement conference proceedings. The conference may be set up so that he will appear in person, by videoconference, or by telephone; he must attend in whatever format Magistrate Judge Illman chooses. Plaintiff is cautioned that he may be sanctioned for failure to comply with an order to participate in a mediation or settlement conference, and such sanctions may include dismissal of part or all of the action. *See* Fed. R. Civ. P. 16(a), (f), and 41(b).

D.   Plaintiff's Request For Copies

Reynolds sent a letter to the Court requesting a copy of pages 72-125 of his deposition. Docket No. 28. The Court does not have those pages. Copies of depositions are not automatically sent to the Court. Rather, the Court record will include parts or all of deposition transcripts only when the parties file them in connection with a pending motion. Here, the excerpts of Reynolds' deposition that were filed by Merenda do not include the requested pages. If Reynolds wants to obtain the other pages from his deposition, he should contact defense counsel or the court reporter who transcribed the deposition.

**CONCLUSION**

For the foregoing reasons, Merenda's motion for partial summary judgment is GRANTED with respect to the events surrounding Reynolds' handcuffing. Docket No. 27. Merenda is entitled to judgment as a matter of law in his favor on the merits of Reynolds' Eighth Amendment claim

based on events surrounding Reynolds' handcuffing and on the defense of qualified immunity for that claim only.

This action is now referred to Magistrate Judge Illman for mediation or settlement proceedings pursuant to the *Pro Se* Prisoner Mediation Program. The Clerk shall send a copy of this order to Magistrate Judge Illman.

**IT IS SO ORDERED**.

Dated: November 12, 2019

_____
SUSAN ILLSTON
United States District Judge